**BOWLES, Administrator, Office of Price Administration, v. STAFFORD.**

**Clv. No. 1101.**

District Court, W. D. Louisiana, Alexandria Division.

Sept. 25, 1944.

Malcolm B. Lafargue, U. S. Atty., of Shreveport, La., James O'Niell, Enforcement Atty., Office of Price Administration, of New Orleans, La., and Philip E. James, Enforcement Atty., Office of Price Administration, of New Orleans, La., for plaintiff.

Stafford & Pitts, of Alexandria, La., for defendant.

PORTERIE, District Judge.

The Price Administrator seeks to enjoin preliminarily the defendant "from directly or indirectly violating the terms and provisions of Maximum Price Regulation No. 445".

The complaint alleges three instances (counts) when the defendant sold commodities "through tying-in agreements or combination sales". The purchasers of goods in each of the counts were present in court and testified. All of the witnesses in this case for plaintiff and defendant, except one for the defendant, are persons known well and intimately by the court for many years.

The first theory of the government in all of the three sales is, for instance in count 1, that because on one day and listed in one invoice there was a sale of two cases of rum, two cases of gin (fifths), and eight cases of gin (pints), the purchase of the rum was "required" by the seller and that, circumstantially at least, there is evidence of a tying-in sale.

In the second count, the same circumstantial inference is suggested when two cases of rum appear similarly with five cases of gin at one and the same time, to be followed later by another invoice, supposedly connected (the two invoices being one transaction), showing the sale of two cases of gin within thirty cases of whiskey, the tying-in being allegedly the two cases of Pete Hagen gin and the two cases of rum being sold as a condition to get the five cases of Private Stock gin and the thirty cases of whiskey.

In the third count, there is sold by the defendant and placed on one invoice one case (fifths) of Galgo rum and two cases (fifths) of whiskey, and four cases (half-pints) of Ron Donna rum, and that the case of rum was a condition for the sale

of the other two items on the invoice is alleged, and that this was a tying-in requirement prohibited by law. The buyer testified in this case, and said there was absolutely no requirement by the seller and that the purchase was made by him voluntarily, under no suasion or compulsion.

The presumption prevailing throughout this case is that whiskey, straight or blended, is a best seller, that rum is not a good seller, and that gin and wine are somewhat in-between.

It developed during the course of the trial, and it was accepted mutually as a fact that there is not enough whiskey to satisfy the desire of the public for intoxicants; that beyond the whiskey there is general demand and sale for rum, wine, liqueurs, etc.

We know the defendant company and its immediate predecessors have been engaged in the liquor business for nearly fifty years, and, though it be engaged in a business which is heavily taxed and highly policed, we have never known of a complaint filed against it in court.

The defendant company's contention is that being engaged in the general liquor business and having a full and complete stock, through its salesmen, following well-established American business methods, it tries to sell any and all types of its stock; that long before the establishment of the O.P.A. it had weekly meetings of its salesmen for the discussion of what was in stock and what should and could be legitimately offered the buying public, etc.; that it has never made a condition to a single one of its clients that in order to get a certain quantity of whiskey there had to be bought a certain quantity of wine or rum or any other type of intoxicant.

The plaintiff offered evidence of other sales by the defendant, in addition to the sales included in the three counts, to show general intent or conduct. The court permitted this evidence over objection of defendant because the main evidence was equivocal, in that, for instance, where there appears a sale of rum and whiskey on the same invoice and on the same date, the government alleges the rum had to be taken by the buyer in order to get the whiskey, while on the other hand the defendant says it is merely a sale of rum and whiskey, one item sold independently of the other, and that it is a sale in the ordinary run of its business, and that there is nothing in the O.P.A. regulations that prevents a buyer from buying two items at one and the same time. There were two witnesses of this type and one testified that he is a very busy man, having a drug store, furniture store, saloon, etc., to manage, that what would happen was that the defendant's representative would walk into his place and he (the witness) would go to him and say, "what do you have today?" the other would mention two or three items and that he would then take it or not take it. Generally, since business was good, he would say, "All right, send me the goods. How much do I owe you for the last sale?" He would give his check and that was the end of the whole interview. This witness ended his testimony by saying that at no time did it ever arise that he was refused the sale of whiskey when he did not take some other item, and particularly stated that he had never been required, induced or compelled to make any tying-in purchase. The other witness, giving evidence of the same character, absolutely failed to help plaintiff's case. We are satisfied that when he said he had been promised ten cases of whiskey if he bought ten cases of wine, he was mistaken. An invoice establishes a scale of ten cases of wine and one case of whiskey. The witness claims that defendant subsequently failed to deliver the nine cases of whiskey. Irrefutable proof comes from the salesman of defendant that this witness of plaintiff was plainly mistaken. We believe the salesman of defendant.

The manager of the buying store in counts 1 and 2 testified in person. He frankly stated that the quantity of whiskey to be had was limited, and had to be rationed, that is, apportioned by the wholesaler; that every liquor dealer knows that; that he was never compelled directly or indirectly to make a purchase, one item being included because of another; that he carried a general store of intoxicating liquors; that in one of the counts the first sale made was for only twenty cases of whiskey, but that later he telephoned and had ten more cases added; that under the general conditions of rationing, particularly as to whiskey, and the demand for it exceeding the supply, dealers had to carry many other items of intoxicating liquor, which he always tried to push because he was never in any trouble in moving his whiskey; that the sale of whiskey alone could not keep him in business, either himself, the dealer, or the wholesaler; that the defendant was kind enough at one time in the past, and this was quite before the injunction

suit of the plaintiff, to accept the return of some $1800 to $1900 worth of various goods in which he had overstocked.

The manager of the liquor business of the defendant gave a full and detailed explanation of what was done in the regulation of its annual two-million-dollar liquor business. It apportioned its whiskey as received to its former buyers in the ratio of previous purchases, irrespective of whether or not anything else was bought. He explained that the defendant had always sold for many years other items and continued to do so since O.P.A., but that there were never any tying-in sales suggested, sought or planned; in fact, that they were particularly prohibited by the management.

Two salesmen of the defendant testified in detail about the sales in the three counts. (There is a fourth count in the complaint, but, because the main witness as to it is now in the armed services and not available, this charge was not pressed.) From their testimony we believe no requirement, suasive or compulsory, was exercised in the making of the specific sales. Generally, they testified that they would reasonably try to sell all they could, yet were always mindful that a customer is never retained if you sell to him a shelf-warmer, or overstock him on an item.

It has been proved in the case that there are a number of local wholesalers, and even since the O.P.A. regulations there is competition among them, all having salesmen seeking business. As a consequence, there could be no real or continued holding up or compulsion by any wholesaler in the establishment of what is known as tying-in sales. If the rum is bought in order to get some whiskey, as a practical necessity, the price of the whiskey when sold would have to include also the cost of the rum. The proof has prevailed in this case—the court establishing it from the first witness and subsequently the plaintiff staying away from further proof, that neither the whiskey nor the rum was sold above the ceiling price.

The circumstance that the ratio of supposedly undesired items to the much-sought whiskey or beer is always very low tends to prove no tying-in requirement, but more likely shows but the natural, uninfluenced, relation of sales between the two.

Another strong point with the court which favors the defendant is that it filed and placed of record all of the business it had done with the two firms involved in the three counts, for the period of January until now, and an examination of these invoices shows a great variety of items, singly and joined.

Additionally, many of the invoices prove many sales were solely of much-sought articles, as follows:

Reynaud and Moreau, by single sale and single invoice: 20 cases beer, 2 cases whiskey, 20 cases beer, 2 cases whiskey, 25 cases beer, 10 cases beer, 10 cases beer, 15 cases beer, 1 case whiskey, 5 cases whiskey, 15 cases beer, 15 cases beer, 3 cases whiskey, 15 cases beer, 15 cases beer, 5 cases whiskey, 15 cases beer, 15 cases beer, 5 cases whiskey, 15 cases beer, 15 cases beer, 5 cases whiskey, 15 cases beer, 10 cases beer, 25 cases ale, 5 cases whiskey, 10 cases beer, 10 cases beer, 50 cases beer, 10 cases beer, 2 cases whiskey.

Intermixed and along with these presumably much-preferred items sold singly, there appear, on different dates and on single invoices, the following: 5 cases of port wine and 1 gallon of lemon mixture; on another invoice, 9 cases of Vermouth wine; on another, 14 cases of mixed wines, on another, 13 cases of whiskey with a half case of gin and a case of rum; on another, 5 cases of sherry and 5 cases of port wine; on another, 7 cases of whiskey and 6 cases of rum; on another, 5 cases of muscatel wine; on another, 3 cases of rum; on another, 45 cases of mixed fruit cordials; on another, 10 cases of port wine; on another, 6 cases of whiskey and 1 case of gin; on another, 1 case of rum and 1 case of gin; on another, 15 cases of wine; on another, 96 gallons of sherry wine; on another, 8 cases of liqueurs and brandies; on another, 5 cases of Burgundy wine, 6 cases of champagne, a bale of whiskey bags, 10 cases of 6 oz. glasses, 2 cases of Tom Collins mixture, 1 gallon lemon mix and 1 case Galgo rum; on another, 1 case of rum; on another, 5 cases of wine, 1 case of rum, and 4 cases of whiskey; on another, 6 cases of rum; on another, 5 cases of gin, 9 cases of port wine, 3 cases of muscatel wine; on another, 1 case of Tom Collins mixture, and on another, 5 cases of whiskey, 2 cases of gin, and 1 case of wine.

We have now covered the total business from January to date between the defendant and Reynaud and Moreau, one of the dealers concerned in one of the counts, the

third one. Our conclusion from these facts, showing such a variety of purchases, and in so many instances purchases of much-sought whiskey solely, is that there is no preponderance of proof to support the third count.

We have made an examination similarly of all the sales as to the other dealer concerned in counts 1 and 2, finding that they are about equal in number and that the same factual situation exists. Consequently, we reach the same conclusion.

We have determined that in the sole decision cited to us, United States v. Armour & Co., D.C., 50 F.Supp. 347, the court there mainly determined that the indictment filed against the defendant, containing the exact language of the law and giving the fact that as a condition of the sale of butter eggs had to be bought, legally defined a crime. No actual trial is yet reached in the cited case; we are satisfied that in the instant case the complaint properly and legally sets out the grounds for the issuance of a preliminary injunction. We do not believe that the facts in the instant case preponderate in favor of the plaintiff to warrant us in granting the issuance of the writ sought.

We recognize, too, that general interpretations by the Administrator have great force and in the decision of this case we have recognized and given full weight to the interpretation of tying agreements (a) and (b). General Application, O.P.A. Service 2-10, page 2-812.

This type of case is difficult of proof by the Administrator. No ceiling price is violated in this case. The violation of a ceiling price case is immediately determinable—one or two reliable witnesses give proof as to the price actually paid and if that price be above the ceiling price, the conviction necessarily follows. With the present case the proof is much the more difficult. What would be a normal business is all we find here. With the facts before us, to characterize the three complaints as violations of the law by the defendant would do violence to our judicial conscience.

It is not only that the evidence does not preponderate in favor of the plaintiff, but there is a want of sufficient proof to establish that degree of legal certainty necessary for judgment.

The preliminary injunction will not be granted. Timely judgment will be signed.